No. 04-175

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 33

AMUIR SEKOU CLAUSELL,

        Petitioner and Appellant,

   v.

STATE OF MONTANA,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause No. DV 02-0620,
The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender Office, Helena, Montana

      For Respondent:

          Hon. Mike McGrath, Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena, Montana

          Dennis Paxinos, Yellowstone County Attorney, Billings, Montana

          Submitted on Briefs:  January 19, 2005

                    Decided:   February 15, 2005

Filed:

_____
                       Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     Amuir Sekou Clausell (Clausell) appeals from the denial of his Petition for Postconviction Relief by the Thirteenth Judicial District Court, Yellowstone County. We affirm.

¶2     Clausell raises the following issues on appeal:

¶3     1. Whether the District Court erred in denying Clausell's Petition for Postconviction Relief based upon prosecutorial misconduct.

¶4     2. Whether the District Court erred in denying Clausell's Petition for Postconviction Relief based upon ineffective assistance of counsel.

## BACKGROUND

¶5     Resolving this appeal requires a limited discussion of the facts, but for a complete background on this matter, *see State v. Clausell*, 2001 MT 62, 305 Mont. 1, 22 P.3d 1111, where we affirmed Clausell's conviction of deliberate homicide. At approximately 3:00 a.m. on March 22, 1997, Clausell delivered Georgiana Trottier (Trottier) to the emergency room at Saint Vincent Hospital in Billings where she later died of a single gunshot wound to the head. Clausell stayed at the hospital while doctors treated Trottier and police officers eventually arrived and questioned him. Over the course of the early morning and during the ensuing investigation, Clausell recounted at least eight different stories about Trottier's shooting to hospital personnel, police officers, and two friends, all of whom testified at trial. Officers arrested Clausell later that morning and proceeded to investigate Clausell's apartment where the shooting took place.

2

¶6     Police officers first found several pieces of evidence outside Clausell's apartment, then knocked and announced their presence, but received no response. The police officers secured the exterior of the apartment and entered the apartment through the rear unlocked sliding glass door in order to look for other victims or suspects and to protect the safety of the officers. This warrantless "protective sweep" turned up Trottier's blood in various locations, including on Clausell's bed, bedding, floor and wall of the bedroom, as well as on the stairs and handrail. The police officers then sought a search warrant for Clausell's apartment.

¶7     While waiting for the search warrant, police officers discovered a .22 caliber pistol with one spent round in the chamber, wrapped in a towel, and located in a bucket immediately outside the back door to Clausell's apartment. Police officers searched Clausell's apartment once they secured the warrant and found .22 caliber ammunition and a life insurance policy, held by Trottier, naming Clausell as the primary beneficiary.

¶8     The District Court appointed Kevin Gillen (Gillen) to defend Clausell. Gillen represented Clausell both at trial and on direct appeal. Clausell's trial defense rested on the claim that Trottier's death had been a "tragic accident." Gillen, Clausell, and a private investigator retained for this matter, jointly developed this "tragic accident" theory as it conformed both with the evidence and Clausell's eighth and final story about what happened. To support this theory, Gillen deemed it necessary to forego objecting to the State's introduction of evidence from the apartment in order to bolster their claim that Clausell was not "hiding anything." The jury convicted Clausell of deliberate homicide and the District

3

Court sentenced him to 100 years in Montana State Prison with an additional 2 years for using a weapon.

¶9 Clausell, with new counsel, filed a Petition for Postconviction Relief (Petition) that focused on alleged prosecutorial misconduct at trial and ineffective assistance of counsel at trial and on direct appeal. The District Court denied all of Clausell's claims without a hearing, except Gillen's failure to suppress evidence from the "protective sweep" of Clausell's apartment. After a hearing on this issue at which two police officers, Gillen, and Clausell testified, the District Court concluded that Clausell failed to carry his burden to establish that the evidence seized from the apartment would have been suppressed, particularly in light of both the inevitable discovery and public safety exceptions to the warrant requirement. The District Court determined that Clausell's "tragic accident" theory provided his best chance of acquittal, especially given that Clausell remained adamant throughout trial, direct appeal, and the postconviction proceeding that a tragic accident is what happened. Furthermore, given Clausell's theory, the District Court found that the defense "necessitated the presentation of all the facts surrounding the tragic accident. The strategic choice of the tragic accident required the evidence seized in [Clausell's] residence be presented at trial." This appeal follows.

STANDARD OF REVIEW

¶10 We review a district court's denial of a petition for postconviction relief to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *State v. Root*, 2003 MT 28, ¶ 7, 314 Mont. 186, ¶ 7, 64 P.3d 1035, ¶ 7 (citation

4

omitted). Claims of ineffective assistance of counsel constitute mixed questions of law and fact that we review *de novo*. *State v. Kougl*, 2004 MT 243, ¶ 12, 323 Mont. 6, ¶ 12, 97 P.3d 1095, ¶ 12 (citations omitted). We measure prosecutorial misconduct by reference to established norms of professional conduct. *State v. Martin*, 2001 MT 83, ¶ 63, 305 Mont. 123, ¶ 63, 23 P.3d 216, ¶ 63 (citations omitted).

## PROSECUTORIAL MISCONDUCT

¶11 Misconduct by a prosecutor may form the basis for granting a new trial where the prosecutor's actions have deprived the defendant of a fair and impartial trial. *State v. Gray* (1983), 207 Mont. 261, 266-67, 673 P.2d 1262, 1265-66 (citations omitted). Clausell contends the prosecutor made a series of improper comments during *voir dire*, closing statement, and rebuttal, that individually, or if taken as a whole, influenced the jury and prejudiced him.

¶12 Clausell attempted to raise similar issues on direct appeal. We did not review the merits of those issues, however, due to Gillen's failure to make timely objections to the prosecutor's statements at trial as required under § 46-20-104(2), MCA. *Clausell*, ¶¶ 43-45. Clausell raised corresponding claims during the postconviction proceedings. Although the District Court noted that Gillen's failure to object to these statements at trial should have been raised on direct appeal, it then stated that "[d]espite the failure to object, this Court will still consider the issue." The District Court then analyzed Clausell's allegations of prosecutorial misconduct before dismissing the issue. Under normal circumstances we would not review separately Clausell's claims of potential misconduct due to his failure to

5

preserve the issue for appeal. *Clausell*, ¶ 45; § 46-20-104(2), MCA. In this case, however, the District Court's decision to analyze the issue and the close nexus between Clausell's prosecutorial misconduct claims and his ineffective assistance of counsel claims leads us to address briefly Clausell's allegations of prosecutorial misconduct.

¶13 First, Clausell argues that the prosecutor improperly attacked Gillen by stating during *voir dire* and closing statement that Gillen was "hiding the ball," thereby implying Gillen lied during the presentation of Clausell's case. The context of the prosecutor's "hide the ball" comments reveals that the prosecutor used the term to remind the jurors of his point during *voir dire* that jurors should use their common sense when deciding this matter. After analogizing about using common sense to make decisions when crossing a street, the prosecutor stated:

> [T]he books, the movies we watch, all hide the ball. . . . That is what you see in the movies. We hide the ball until the last minute when the butler in the back jumps up and screams, I did it.
>
> I just want to make sure we can all use our common sense. Can we all agree on that?

The prosecutor revisited his *voir dire* comments about common sense during his closing statement: "Counsel, ladies and gentlemen, you have heard a masterful job by a very eloquent attorney at attempting to hide the ball. . . . Now we agreed we could use our common sense in accordance with the Judge's instructions." He then related a story about his child's friend lying to him in order to focus the jury's attention on Clausell's conflicting stories. The record confirms that the prosecutor's comments did not constitute prosecutorial misconduct as they were not meant to impugn Gillen's credibility, but to keep the jury

6

focused on the evidence presented.

¶14 Clausell next argues that the prosecutor improperly commented on Clausell's credibility and inferred he was lying when, during closing statement, the prosecutor related the story about his child's friend lying to him and immediately tied that story to Clausell's defense theory. The State points out, however, that Clausell takes these comments out of context. Indeed, the record shows that this story formed part of the same example Clausell used to allege that the prosecutor improperly attacked Gillen. The State contends that the prosecutor referred to Clausell's conflicting statements and, through the use of analogy, illustrated how a decision-maker weighs the inconsistent statements against the physical evidence in order to find the truth. We agree.

¶15 Clausell also takes issue with a rebuttal statement by the prosecutor regarding Clausell's possible use of a towel or pillow to muffle the gunshot noise despite the lack of physical evidence presented to corroborate that contention. Clausell maintains that the State's firearm expert concluded that the towel found in the bucket had not been wrapped around Clausell's gun when fired. He argues, therefore, that the prosecutor's statements regarding attempts to muffle the gunshot noise were "meant to inflame the jury's passions so they would disregard his defense that Trottier shot the gun."

¶16 We reject Clausell's contention on the ground that Clausell had an opportunity to present his alternate explanations at trial. Indeed, Clausell consistently held to his defense theory of a tragic accident, which by its very terms, concedes that there had been a gunshot. Clausell's sole defense was that he did not shoot the gun; a defense that Clausell consistently

7

promoted throughout the trial. The jury had ample opportunity to consider whether Clausell fired the gun, and the State certainly had the right to refute his defense theory. The record also demonstrates that the prosecutor's statement properly offered a possible explanation why Clausell's neighbors had not heard a gunshot. The prosecutor appropriately inferred why no neighbors heard a gunshot and his comments seem particularly fitting given that police officers found the gun in a bucket wrapped in a towel outside of Clausell's apartment.

¶17 Finally, Clausell argues that the prosecutor violated his due process rights when the prosecutor urged jurors to put themselves in the place of Trottier. The prosecutor actually asked the jury not to put themselves in Trottier's shoes, but instead asked the jury to follow the evidence trail left by Trottier's body and determine "what speaks for [Trottier]? The evidence, Defendant's actions, Defendant's admissions." These isolated incidents of which Clausell complains do not constitute prosecutorial misconduct.

¶18 Even if we gave Clausell the benefit of the doubt and determined that any single prosecutor comment, or these comments taken cumulatively, constituted error, Clausell has not demonstrated such error affected the trial's outcome. *See State v. Kills on Top* (1990), 243 Mont. 56, 95, 793 P.2d 1273, 1299. Here the prosecutor's comments focused on rebutting Clausell's "tragic accident" theory. The State presented sufficient evidence for jurors to find Clausell guilty of deliberate homicide, *see Clausell*, ¶ 35, and the District Court correctly admonished jurors to base their verdict only on the evidence before them. We conclude that Clausell did not establish that the prosecutor engaged in misconduct.

8

## INEFFECTIVE ASSISTANCE OF COUNSEL

¶19 The Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee the right to effective assistance of counsel. We have adopted the two-part test of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, to evaluate ineffective assistance of counsel claims. *Kougl*, ¶ 11. Clausell first must demonstrate his counsel's actions fell below an objective standard of reasonableness or were deficient. *Kougl*, ¶ 11. Clausell must overcome a strong presumption that his counsel's defense strategies and trial tactics fall within a wide range of reasonable and sound professional decisions. *Davis v. State*, 2004 MT 112, ¶ 20, 321 Mont. 118, ¶ 20, 88 P.3d 1285, ¶ 20. If Clausell meets the first prong, he then must show that his counsel's deficient performance prejudiced him to the extent that a reasonable probability exists that the result of the proceeding would have been different had counsel not performed ineffectively. *Kougl*, ¶ 11. A reasonable probability means a probability sufficient to undermine confidence in the outcome, but it does not require that a defendant demonstrate he would have been acquitted. *Kougl*, ¶ 25.

¶20 Many of Clausell's claims of ineffective assistance of counsel relate back to Gillen's failure to object to the prosecutor's comments made during *voir dire*, closing statement, and rebuttal. A defense counsel's use of objections lies within his or her discretion; a failure to object must, beyond being error, also prejudice the defendant. *State v. Campbell* (1996), 278 Mont. 236, 250, 924 P.2d 1304, 1313. It is not unreasonable, however, that counsel, as a trial tactic, would refrain from objecting during opening and closing statements. *See Dawson*

9

*v. State*, 2000 MT 129, ¶ 105, 301 Mont. 135, ¶ 105, 10 P.3d 49, ¶ 105 (commenting that the failure to object during closing argument and opening statement is within the "wide range" of permissible professional legal conduct). It is also not beyond the realm of reasonableness that defense counsel would not object during certain times of the trial so as not to confuse the jury or bring undue attention to the prosecution's case. *See State v. Olson*, 2004 MT 158, ¶ 17, 322 Mont. 1, ¶ 17, 92 P.3d 1204, ¶ 17 (noting that any number of reasons not apparent on the record may explain why an attorney chooses not to lodge an objection).

¶21 In this case, most of these potential objections related to what Clausell claims to be instances of prosecutorial misconduct. Of course, we held in ¶ 18 above that no prosecutorial misconduct occurred. Thus Gillen's failure to lodge objections to those statements cannot be deemed ineffective assistance of counsel. Moreover, the record demonstrates that Gillen made motions *in limine*, timely objected to evidence offered by the State that resulted in certain testimony being precluded, and presented a viable defense to the jury. Given the strong presumption that Gillen's defense strategies and trial tactics fall within a wide range of reasonable and sound professional decisions, the District Court correctly determined that Clausell failed to carry his burden of establishing that Gillen's lack of objections fell below an objective reasonableness standard.

¶22 Clausell further argues that Gillen's failure to seek to suppress the evidence obtained during the search of Clausell's apartment constitutes ineffective assistance of counsel. Clausell arrived at the emergency room claiming Trottier had suffered a head injury and

needed help getting out of his car, but failed to inform the medical personnel that her head injury resulted from a gunshot wound suffered inside his apartment. Once the medical personnel discovered the gunshot wound and related Clausell's improbable story to police officers, the officers likely had sufficient probable cause to search the apartment. And yet, Clausell continued to provide further inconsistent statements to the police officers thereby bolstering a finding of probable cause to search the apartment. During their investigation, the police officers found a .22 caliber pistol with one spent round in the chamber wrapped in a towel inside a bucket located immediately outside Clausell's apartment. The police officers properly searched the area outside of Clausell's apartment as he possessed no reasonable expectation of privacy in the exterior of his apartment, particularly given that the bucket was apparently in plain view. *See State v. Hubbell* (1997), 286 Mont. 200, 210, 951 P.2d 971, 977 (holding that there is no legitimate expectation of privacy with respect to property leading up to and including the threshold of a residence, therefore police officers were well within their authority to proceed on the open walkway to the front door, where they saw evidence in plain view).

¶23 Under these circumstances, the fact that police officers then conducted a "protective sweep" of Clausell's apartment after entering through an unlocked back door before obtaining a warrant likely would not have tainted the ultimate search. The police officers surely could have obtained a warrant to search Clausell's apartment based upon the events at the hospital, his inconsistent statements to police officers and medical personnel, and the discovery of the gun outside his apartment. Therefore, under the inevitable discovery

11

doctrine, the evidence seized at Clausell's apartment would have been allowed. *See State v. Nottie*, 2003 MT 170, ¶ 20, 316 Mont. 345, ¶ 20, 71 P.3d 1233, ¶ 20.

¶24 Even if Gillen's failure to seek to suppress the search of Clausell's apartment constitutes deficient performance, Clausell still must demonstrate prejudice to the point that a reasonable probability exists that the result of the proceeding would have been different. Any attempt by Gillen to suppress the evidence would not have changed the outcome of trial given the facts supporting the probable cause to search and the inevitable discovery of the evidence. Therefore, Clausell failed to carry his burden of establishing that Gillen provided ineffective assistance of counsel by not attempting to suppress the evidence.

¶25 Finally, Clausell argues that Gillen performed ineffectively during his appellate representation based upon an inherent conflict of interest resulting from the fact that Gillen would have to advocate his own ineffectiveness to succeed on several of the issues that should have been raised on direct appeal. Clausell maintains that the issues Gillen raised on direct appeal failed because Gillen asked this Court to review trial errors he failed to preserve properly by not making timely objections. *See Clausell*, ¶¶ 26, 45. Even if Gillen had properly preserved the alleged trial errors, Clausell was not prejudiced because Gillen's lack of objections did not constitute ineffective representation, as discussed in ¶¶ 20-21 above. Therefore, we do not feel it necessary to analyze this issue under these facts.

¶26 In the final analysis, Clausell has failed to overcome the strong presumption that Gillen's defense strategies and trial tactics fell within a wide range of reasonable and sound professional decisions. Although he may not agree with the tactics or decisions that were

12

made, particularly because he was convicted and sentenced to prison, he has not demonstrated in this appeal that Gillen's actions fell below an objective standard of reasonableness or were deficient. Even if some of the decisions could be deemed sufficient to pass the first *Strickland* prong, Clausell has not shown he was prejudiced to the point that a reasonable probability exists that the result of the proceeding would have been different had counsel not performed ineffectively. We conclude that Clausell has failed to meet his burden in demonstrating that Gillen provided ineffective assistance of counsel in this matter and the District Court correctly denied Clausell's Petition for Postconviction Relief. We affirm the District Court on both issues.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM RICE

Justice James C. Nelson dissents.

¶27    I cannot agree with our Opinion. As long as we are going to address the individual claims of prosecutorial misconduct, I would hold that the cumulative effect of such misconduct prejudiced Clausell's right to a fair trial and that his trial counsel did not render constitutionally effective assistance by reason of counsel's failure to object.

¶28    We have held that a prosecutor's primary interest should be to see that justice is done, and not simply to obtain a conviction. *State v. Hart* (1981), 191 Mont. 375, 381, 625 P.2d 21, 25, *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981) (citing *Berger v. United States* (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314). *See also ABA Standards for Criminal Justice* § 3-1.2(b) and (c) (3d ed. 1993) (hereinafter *ABA Standards*) ("The duty of the prosecutor is to seek justice, not merely to convict.").

¶29    It is well settled that a prosecutor may not make derisive comments about opposing counsel. *United States v. Frederick* (9th Cir. 1996), 78 F.3d 1370, 1379-80 (reversed for cumulative error including comments about defense counsel's skill in confusing a witness and saying that defense counsel would ask the jury to consider bits and pieces of the evidence); *Bruno v. Rushen* (9th Cir. 1983), 721 F.2d 1193, 1195, *cert. denied*, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984) (criticizing prosecution's statements that defense counsel acted in underhanded and unethical ways); *United States v. Rodrigues* (9th Cir. 1998), 159 F.3d 439, 451 (holding that the prosecutor's statements that defense counsel had "from the start been trying to deceive the jury and had told the jury what was 'flat out untrue'" were improper); *United States v. Friedman* (2d Cir. 1990), 909 F.2d 705, 708-10

14

(criticizing as grossly improper prosecutor's comments that defense counsel would have the jury pull the wool over its eyes).

¶30    In the case *sub judice*, the prosecutor commented in *voir dire* that "tricky" lawyers, such as those seen on television, always try to "hide the ball." He explained to the jury that his mother did not trust lawyers because they "hide the ball." The prosecutor also related that where he grew up in Northeastern Montana, attorneys were created somewhere and were brought in to be confrontational and "tricky." Then, in his rebuttal argument at closing, the prosecutor stated: "Counsel, ladies and gentlemen, you have heard a masterful job by a very eloquent attorney at attempting to hide the ball." Aside from demeaning lawyers in general, the law does not permit these sorts of comments.

¶31    In *Frederick*, the court held that, while the prosecutor's comment about defense counsel being a skillful cross examiner who confused the victim was not improper, the comment that defense counsel "is asking you to look at little bits and pieces" was improper because, among other reasons, it implied that defense counsel was asking the jury not to see the truth. *Frederick*, 78 F.3d at 1379-80. In the instant case, the prosecutor's comments that tricky lawyers attempt to hide the ball is on par with the "bits and pieces" comment in *Frederick*. In both cases, the prosecutor is telling the jury that defense counsel is asking the jury not to see the truth.

¶32    To make matters worse, the prosecutor also related a story to the jury about an incident between his daughter and a neighbor child:

> Last summer my daughter Katie and our neighbor friend David were playing in the backyard. My wife and I were in the living room watching TV,

15

and when all of a sudden Katie burst through the back door, bawling, "David hit me," and we look as she's running in the bathroom and she's bleeding from her left ear.

My wife goes into the bathroom to take care of the small cut on Katie's left ear, and I thought I better go and find out what happened.

So I called Dave in and I asked Dave, "What happened?" And he looks at me, being about seven years old, and says, "You know, Katie was swinging on the swing, doing that trick she does where she rocks back and forth, and she fell off."

And I hear Katie call from the bathroom, "Huh-uh." And so I look at Dave and I said, "Dave, what did you do?" "Nothing."

I hear from the bathroom, "Huh-uh."

So I said, "Dave, did you touch Katie?"

"Well, I was pushing her, but I was just pushing her back because she wanted to be pushed."

"Okay, so you did at least come in contact with her?"

"Yeah."

"Did you come in contact with her head?"

"Well, I might have as I was pushing her."

"So you did hit her in the ear?"

"Well, yeah, but see, um, we were running to the swing, and a, we were going to grab it, and she grabbed it and took it away, and she wouldn't share the swing with me."

¶33 After telling this irrelevant, non-record, personal story to the jury, the prosecutor then tied the neighbor child's false statements into Clausell's version of the events, suggesting that Clausell was lying.

¶34 We have consistently condemned trial counsel who invade the province of the jury by injecting their personal opinions on witness credibility. *State v. Stringer* (1995), 271 Mont. 367, 380, 897 P.2d 1063, 1071; *State v. Arlington* (1994), 265 Mont. 127, 157, 875 P.2d 307, 325.

¶35 Moreover, in *State v. Stewart*, 2000 MT 379, 303 Mont. 507, 16 P.3d 391, we specifically condemned the story-telling tactic used by the prosecutor in this case. In *Stewart*, the prosecutor told the jury an irrelevant story about a rape case he had prosecuted

16

and lost, and made comments about Missoula County needing a new jail. *Stewart*, ¶¶ 35-36. The prosecutor also told the jury that Stewart's denials were so common that prosecutors had named Stewart's defense the "some dude" defense: "Blame it on somebody, some dude, some dude sitting out there." *Stewart*, ¶ 41. In *Stewart*, the State conceded that the latter remarks were improper because they referred to matters outside the record and to the prosecutor's own experience and because they were an improper comment on witness credibility and simply the prosecutor's personal opinion. *Stewart*, ¶¶ 41-42 (citing *Stringer*, 271 Mont. at 380-81, 897 P.2d at 1071; *State v. Gladue*, 1999 MT 1, ¶ 21, 293 Mont. 1, ¶ 21, 972 P.2d 827, ¶ 21). On remand for a new trial, we admonished the prosecutor not to refer to the rape story, the need for a new jail in Missoula, and the "some dude" defense. *Stewart*, ¶ 45.

¶36     The prosecutor in this case committed precisely the same sort of misconduct that we condemned in *Stewart*. He referred to an irrelevant, non-record, personal story about a neighborhood child being caught in a lie and, from that, he then characterized Clausell as a liar: "Now, isn't that really what we have in this case?" "Just like my good friend David who went through a bunch of stories, didn't line up; this one doesn't either."

¶37     Our precedent clearly condemns the tactics that the prosecutor used here. He injected irrelevant, non-record facts, which were based on his personal experience, into the case and he then used those to invade the province of the jury by commenting on Clausell's credibility.

¶38     As to the matter of Clausell using a pillow or towel to muffle the gunshot noise, discussed in ¶ 15 of the Court's Opinion, there was no evidence in the record to support the

17

prosecution's argument to that effect. Indeed, the State's firearms expert concluded that the rags found in the bucket with the gun were not wrapped around Clausell's gun when fired. And, the State failed to produce any evidence of any other item being wrapped around the gun. The State's muffled-gun theory was pure conjecture without support in the record.

¶39    In closing arguments, the prosecutor may argue all reasonable inferences from the record. *ABA Standards* § 3-5.8(a). "The most elementary rule governing the limits of argument is that it must be confined to the record evidence and the inferences that can reasonably and fairly be drawn from it." *ABA Standards* § 3-5.8(a) Commentary. Convictions based on prosecution arguments unsupported by record-based evidence are properly reversed. *See United States v. Manning* (1st Cir. 1994), 23 F.3d 570, 575; *United States v. Teffera* (D.C. Cir. 1993), 985 F.2d 1082, 1089; *United States v. Forlorma* (2d Cir. 1996), 94 F.3d 91, 93-94. The same result should obtain here.

¶40    Finally, we dismiss Clausell's argument that the prosecutor violated Clausell's due process rights when the prosecutor urged jurors to put themselves in the place of the victim. Here the prosecutor twice asked the jury to assume the position of the dead victim as if she was present in the court room. The prosecutor stated: "You see, Ms. Trottier, Georgie, does not want your sympathy, ladies and gentlemen. She's dead. She wants justice." He also asked the jury to "imagine" as if they were Ms. Trottier, sitting in the court room trying to direct the jury about what evidence was important. Combining these two themes, the prosecutor then stated: "Georgie's voice is crying out to you through those things. I ask, please go in, listen to Georgie's voice, and come out and tell this Defendant that you heard it, Guilty, guilty."

¶41 These types of "Golden Rule" arguments are improper, as they interfere with the jury's objectivity. *See Boyington v. State* (Tex. Ct. App. 1985), 738 S.W.2d 704, 708-10; *DeJesus v. Flick* (Nev. 2000), 7 P.3d 459, 464; *McGuire v. State* (Nev. 1984), 677 P.2d 1060, 1064.

¶42 I conclude that the cumulative effect of the foregoing incidents of prosecutorial misconduct prejudiced Clausell's rights to due process and to a fair trial. *United States v. Roberts* (1st Cir. 1997), 119 F.3d 1006, 1016. Our Opinion makes the same mistake as did the District Court--we view each of these incidents of prosecutorial misconduct in isolation and ignore their combined effect.

¶43 Finally, I would hold that Clausell was not given constitutionally effective assistance of counsel by reason of his counsel not objecting to any of the foregoing misconduct. This failure was not preserved for appellate review, as it should have been, and now we have thrown holy water on the prosecutor's misconduct and defense counsel's failure to object to it. Clausell's right to due process and to a fair trial has been violated. *Gravley v. Mills* (6th Cir. 1996), 87 F.3d 779; *Hagen v. State*, 1999 MT 8, ¶ 20, 293 Mont. 60, ¶ 20, 973 P.2d 233, ¶ 20.

¶44 In failing to apply the proper precedent to the prosecutor's misconduct in this case, we have, unfortunately, significantly lowered the bar for the performance of trial counsel in future cases and, worse, our Opinion will simply encourage more of the same improper conduct.

¶45 I would reverse and remand this case for a new trial. I dissent from our failure to do so.

/S/ JAMES C. NELSON