JUSTICE MCKINNON,
dissenting.
¶86 After consideration of the record in its entirety, I conclude there was plain error when the prosecutor “channeled” the eight-month-old victim during closing arguments. Accordingly, I respectfully dissent from the Court’s holding under Issue 4 that the District Court did not *254 abuse its discretion in denying Ugalde’s motion for a new trial.
¶87 While under the care and supervision of his babysitter (Ugalde), eight-month-old I.N. suffered a serious head injury causing acute bilateral subdural hematomas, brain swelling, and severe bilateral retinal hemorrhaging. As a result, I.N. likely will have permanent deficiencies in his motor skills and cognitive development. It is doubtful that a prosecutor could have a more sympathetic victim than an eight-month-old infant who, allegedly, was abused by his caretaker.
¶88 In the Information, the State alleged that Ugalde had “purposely or knowingly caused serious bodily injury to another, to-wit: the Defendant shook or slammed I.N. (born in October 2007) causing him serious bodily injury,” in violation of §45-5-202(1), MCA (“A person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another ....”). As is an accused’s right, Ugalde was not comfortable with stipulating to “serious bodily injury” and, thus, required the prosecution to meet its burden of proving every element of the offense charged. Nevertheless, in her opening statement, defense counsel acknowledged to the jury that I.N. had suffered serious bodily injury: “[Nevada] had her own young child, and she was baby-sitting [I.N.] in her own home when he suffered a terrible accident and he was seriously injured.” During her closing argument, defense counsel again acknowledged that ‘1 told you out of the gate we weren’t going to contest that the injuries were serious in this case. That was never an issue. The issue in this case is causation.”
¶89 Ugalde’s approach is understandable, given that her defense related to causation. Testimony regarding the nature of I.N.’s injuries overlapped with testimony regarding the seriousness of those injuries, and defense counsel could not risk that a pretrial stipulation to “serious bodily injury” would foreclose her from examining experts at trial regarding the nature of the injuries as relevant to causation. We implicitly acknowledge counsel’s dilemma in our observation that a “[t]horough review of the record reveals that it is often impossible to separate which evidence went to the causation element and which went to the serious bodily injury element; the extent of the injuries was a factor for the jury to consider in determining both seriousness and causation.” Opinion, ¶ 48.
¶90 Consequently, the prosecution produced ten witnesses who testified to various aspects of I.N.’s injuries and treatmentmuch of it overlapping and cumulative. While it would be unreasonable to prevent the State from developing its case regarding serious bodily *255 injury, a defendant does not waive objections to prejudicial or cumulative evidence by insisting that the State meet its burden of proof. Ugalde still had the right to have relevant evidence excluded from consideration by the jury if its probative value was substantially outweighed by the danger of unfair prejudice or by considerations of needless presentation of cumulative evidence. M. R. Evid. 403.
¶91 The District Court refused to hold the State at fault ‘for preparing a thorough presentation of its case” and ultimately determined, in balancing the cumulative and prejudicial nature of the evidence against its probative value, that the complicated nature of I.N.’s injuries warranted testimony from each of the ten witnesses. In my view, this was a close call. However, we review such rulings for abuse of discretion, and the question under this standard is not whether we would have reached the same decision, but whether the trial judge acted arbitrarily without conscientious judgment or exceeded the bounds of reason. Newman v. Lichfield, 2012 MT 47, ¶ 22, 364 Mont. 243, 272 P.3d 625. I agree with the Court’s implicit holding that the District Court did not act arbitrarily without conscientious judgment or exceed the bounds of reason in allowing the prosecution to present the testimony of all ten witnesses. Opinion, ¶¶ 49-50. Given that I.N. suffered a serious head injury, it is not surprising that the impact of this primary injury would be observed through many, if not all, aspects of I.N.’s physical and mental well-being.
¶92 Nevertheless, the impact on the jury of hearing ten experts testify to each aspect of I.N.’s injuries and treatment is relevant to, and provides context for, the prosecutor’s improper closing argument. The State’s first witness was Dr. Brian Starr, I.N.’s pediatrician. Dr. Starr testified that before the June 11, 2008 injury, I.N. was a developmentally normal child, but that since the injury, I.N.’s skull was not growing normally. Dr. Starr stated that this was indicative of a severe brain injury and that I.N. is permanently impaired as a result of this injury. Dr. Starr also stated that he has treated children who suffered short-distance accidental falls and that he had never seen, in such cases, the same “constellation of injuries” that I.N. had suffered. ¶93 Next, Holly Taylor, a physical therapist, described I.N.’s motor skills and how I.N.’s developmental delays in his motor skills are a result of his brain injury. Tanya Sciuchetti, a pediatric occupational therapist, also testified that I.N. was delayed in his motor skills due to his brain injury. Carol Morse, a speech and language pathologist, testified that I.N.’s speech development has been delayed as a result of his brain injury.
*256 ¶94 Dr. Eugen Dolan, a neurological surgeon, testified that I.N. suffered a severe head injury with bleeding inside the skull. When cross-examined on causation, Dr. Dolan was somewhat equivocal but did agree that I.N.’s injuries could have been caused by the trauma of falling from a crib. He admitted that he could not rule out accidental trauma as a potential cause. Dr. Linda Johnson, a pediatrician, also described I.N.’s injuries and her treatment of those injuries. She stated that I.N.’s injuries were severe, and she was 95 to 97 percent sure that the injuries were the result of nonaccidental trauma.
¶95 Dr. Curtis Lee, an emergency room physician, testified that it was apparent I.N. had suffered “a severe head trauma.”He described I.N.’s injuries and testified about his treatment of I.N. Dr. Lee acknowledged that he had not ruled out accidental trauma as a potential cause of the injuries; however, he opined that the history he had been given regarding the mechanism of injury-i.e., that I.N. had fallen out of a crib-did not account for the severity of the injuries he had observed in I.N.
¶96 Dr. Andrew Sirotnak, of Denver Children’s Hospital in Colorado, is a pediatrician who specializes in child abuse cases. Dr. Sirotnak described I.N.’s injuries and testified that these injuries were not consistent with a linear fall of less than three feet onto a carpeted floor. Rather, in his opinion, this was a case of physical abuse or nonaccidental trauma. While he could not specify the mechanism of injury, Dr. Sirotnak opined that I.N.’s injuries were consistent with rapid acceleration-declaration, such as whiplash.
¶97 Dr. Daniel Weaver, a pediatric ophthalmologist, described the injuries to I.N.’s eyes and stated that surgical treatment of the eyes had been necessary due to I.N.’s head injury. Dr. Weaver testified that, in his experience, he had never seen I.N.’s constellation of injuries-bilateral retinal hemorrhages, bilateral vitreous hemorrhages, and an afferent pupil defect-in a child who had fallen from a height of less than four feet. He conceded, however, that such injuries could result from such a fall.
¶98 Lastly, Dr. Wilbur Smith, a pediatric radiologist, testified that I.N. had suffered severe abusive head trauma. In Dr. Smith’s opinion, I.N.’s injuries were not the result of a short-distance fall but, rather, were the result of being shaken or slammed. He conceded on cross-examination, however, that the nature of the injuries by themselves did not establish abusive treatment by a caregiver-for example, they theoretically could have been the result of a motor vehicle accident-and thus it was necessary to consider the reported history *257 about the injuries. Nevertheless, Dr. Smith maintained the opinion that I.N.’s injuries were not due to a fall from his crib.
¶99 In addition to the foregoing experts, the State called Susan Napier, I.N.’s mother. Through Susan, the State introduced State’s Exhibits 3 through 6 into evidence. Exhibits 3 and 4 are pictures taken of eight-month-old I.N. at his sister’s birthday party on June 1, 2008. Exhibit 5 is a picture of I.N. at the hospital in June 2008 following his injury. He is shown in a medically induced coma with IVs, a catheter, and a head wrap. Exhibit 6 is a picture of I.N. in January 2009 after his second eye surgery. He is shown with a patch over his left eye.
¶100 The prosecution’s initial closing argument, presented by Deputy County Attorney Juli Pierce, began as follows:
May it please the Court, counsel, ladies and gentlemen of the jury. What a difference a day makes. Before June 11th of 2008,1 was a normal, healthy, happy kid. My parents and I had hopes and dreams for me. This is me on June 1st of 2008 at my sister Anastasia’s birthday party. [Jury is presumably shown State’s Exhibits 3 and 4, depicting I.N. at the birthday party.] After June 11th of 2008,1 would never ever, ever be the same again. My life and the lives of my family would be drastically changed forever because of what my baby-sitter, the Defendant, did to me.
That morning, on June 11th of 2008,1 was a normal kid. My mom and my grandma dropped me off at the Defendant’s house who had been baby-sitting me for a couple of months. Sometime in the early afternoon, my trusted caretaker, that woman, shook me and slammed me to the point of having severe closed head injury causing me to look like this. [Jury is presumably shown State’s Exhibit 5, depicting I.N. in a medically induced coma.] And after June 11th of 2008,1 had more and more surgeries, and more issues, and the Defendant caused me to look like this. [Jury is presumably shown State’s Exhibit 6, depicting I.N. following his second eye surgery.] Now, I can’t walk normally without braces on, or else I walk on my tiptoes. Now, I can’t hang out with kids my own age because I can’t say what I want to do or what I need. I can’t tell my mom I love her. I can’t say what I want or what I need because at age two-and-a-half I can only say three words. [Jury is shown a video, apparently State’s Exhibit 19, which shows I.N. at his home interacting with his mother in April 2010.] My life will never be the same, and my family’s lives will never be the same because of what the Defendant did to me on June 11th of 2008.
*258 At the conclusion of her argument, Pierce asked the jurors to “tell the Defendant that you know what happened that day, and you find her guilty.”
¶101 At the outset of her rebuttal closing argument, Pierce remarked: “We talked ... at length in voir dire about child abuse. We talked about child abuse usually occurring behind closed doors, two people, perpetrator/victim.” Pierce asserted that “[I.N.] was the only witness, besides the Defendant, to tell you what happened to him on June 11th of 2008.” (I.N. did not actually testify.) Pierce concluded with the following: “[I.N.] can’t speak. He can’t sit in that chair and tell you what happened to him. But you heard all those witnesses, and it’s like [I.N.] was speaking to you. And you tell [I.N.] that you heard him, and you find the Defendant guilty.”
¶102 “Channeling the victim” is a technique by which a lawyer speaks to the jury in the first person as though she is the injured or deceased person. It is calculated to produce a dramatic and emotional impact on the jury by bringing to life in the courtroom a dead victim or a victim who-as here-eannot testify. In my view, a prosecutor who channels an eight-month-old infant, states that “I can’t tell my mom I love her,” and asks the jury to “tell [the infant] that you heard him” has engaged in misconduct calling into doubt the fundamental fairness of the trial itself.
¶ 103 Channeling gained national attention in conjunction with John Edwards’s 2004 presidential campaign. Nineteen years earlier, Edwards (a North Carolina lawyer at the time) litigated an action against an obstetrician for negligently failing to perform a cesarean section that allegedly would have prevented the child’s cerebral palsy. Edwards stood before the jury and channeled the words of the unborn baby girl. Referring to an hour-by-hour record of a fetal heartbeat monitor, he told the jury: “She said at 3, ‘I’m fine.’ She said at 4, ‘I’m having a little trouble, but I’m doing O.K.’ Five, she said, ‘I’m having problems.’ At 5:30, she said T need out.’ ” Edwards continued: ‘She speaks to you through me. And I have to tell you right now-J didn’t plan to talk about this-right now I feel her. I feel her presence. She’s inside of me, and she’s talking to you.” The jury awarded Edwards’s client $6.5 million, but the trial court subsequently ruled the award “excessive,” observing that it had been given “under the influence of passion and prejudice.”The parties ultimately settled for $4.25 million. See Adam Liptak & Michael Moss, In Trial Work, Edwards Left A Trademark, N.Y. Times (Jan. 31, 2004).
¶104 Most likely attributable to CLE presentations and trial- *259 advocacy publications, the “art” of channeling has spread beyond the civil trial. Prosecutors apparently will risk manipulating and misstating the evidence in order to present an emotional appeal, even when they have ample and convincing evidence to convict. Drayden v. White, 232 F.3d 704, 711-13 (9th Cir. 2000); U.S. v. Rodriguez, 581 F.3d 775, 803 (8th Cir. 2009); Kills on Top v. State, 273 Mont. 32, 51, 901 P.2d 1368, 1380 (1995); cf. Clausell v. State, 2005 MT 33, ¶ 17, 326 Mont. 63, 106 P.3d 1175; Clausell, ¶¶ 40-41 (Nelson, J., dissenting).
¶105 With respect to various types of conduct, this Court has been clear. It is improper for a prosecutor to offer, personal opinions regarding witness credibility. State v. Daniels, 2003 MT 247, ¶ 26, 317 Mont. 331, 77 P.3d 224; State v. Gladue, 1999 MT 1, ¶ 15, 293 Mont. 1, 972 P.2d 827; State v. Rodgers, 257 Mont. 413, 417, 849 P.2d 1028, 1031 (1993). Statements by a prosecutor expressing a personal opinion about the guilt of the accused are likewise improper. Gladue, ¶ 21; State v. Stringer, 271 Mont. 367, 381, 897 P.2d 1063, 1071-72 (1995). It also is improper for the prosecutor to comment on evidence not of record during closing argument. Gladue, ¶ 14. However, this Court has not addressed directly whether channeling the victim in closing argument constitutes reversible misconduct.
¶106 The issue arose in Kills on Top, where we considered whether defense counsel’s failure to object to the prosecutor’s summation of the evidence, in which the prosecutor portrayed himself as the victim and narrated in the first person, constituted ineffective assistance. We held that counsel was not deficient because fit appears that all material statements contained in the prosecutor’s narration from the standpoint of the victim were supported by testimonial or other evidence admitted at trial.” Kills on Top, 273 Mont. at 51, 901 P.2d at 1380. But we declined to consider whether channeling the victim actually constituted prosecutorial misconduct. Kills on Top, 273 Mont. at 62, 901 P.2d at 1387.
¶107 In the civil context, the issue of channeling arose recently in a medical malpractice action where the plaintiffs attorney assumed the persona of the plaintiffs deceased husband and delivered a first-person narrative recounting the events leading to his death. Heidt v. Argani, 2009 MT 267, ¶ 5, 352 Mont. 86, 214 P.3d 1255. Counsel used phrases such as “oh my God, I’m dying,” and then described being autopsied, including a description of being cut open and of the decedent’s sorrow at not getting to see his children grow up. Heidt, ¶ 5. At this point, one of the jurors announced that she was “not okay” and that she thought she was going to pass out. The defendant-physician (Argani) proceeded *260 to render assistance. Heidt, ¶ 6. On appeal, we considered whether the plaintiffs motion for a mistrial should have been granted. Heidt, ¶ 12. We concluded, in light of the unique circumstances of the case-i.e., a medical malpractice trial in which the jury gets to see the defendant doctor reacting to a real-life situation and apparently successfully delivering life-saving care-that a mistrial should have been granted. Heidt, ¶¶ 16-17. We did not address the propriety of counsel’s channeling.
¶108 Outside Montana, the Eighth Circuit observed in Rodriguez that a prosecutor may not express an opinion implying knowledge of facts unavailable to the jury and that it is improper to ask jurors to put themselves in the place of the victim. 581 F.3d at 803. However, the Court of Appeals noted disagreement among courts about whether a defendant is unfairly prejudiced by a prosecutor’s statement that she “speaks for” a victim. Rodriguez, 581 F.3d at 803.[1] While the cases cited in Rodriguez are distinguishable from the present case in that they did not involve a prosecutor narrating in the voice of the victim, the cases nevertheless demonstrate how courts will view the range of prosecutorial conduct.
¶109 Our criminal justice system is premised on certain fundamental principles. One of those principles was aptly described by Justice Sutherland of the United States Supreme Court almost 80 years ago:
The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and *261 whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a ■peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.
Berger v. U.S., 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935).
¶110 In a similar vein, Chief Justice McGrath recently observed that ‘Ta] prosecutor is an officer of the court” who “must strive to promote justice and the rule of law.” State v. Criswell, 2013 MT 177, ¶ 57, 370 Mont. 511, 305 P.3d 760 (McGrath, C.J., concurring). Unfortunately, however, “ ‘some prosecutors have permitted an excess of zeal for conviction or a fancy for exaggerated rhetoric to carry them beyond the permissible limits of argument.’ ” Criswell, ¶ 55 (McGrath, C.J., concurring) (quoting ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8, Commentary, 107 (3d ed., Am. B. Assn. 1993)). ‘Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor’s arguments, not only because of the prestige associated with the prosecutor’s office, but also because of the fact-finding facilities presumably available to the office.” ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8, Commentary, 107. Accordingly, a prosecutor “should not make arguments calculated to appeal to the prejudices of the jury” and “should refrain from argument which would divert the jury from its duty to decide the case on the evidence.” ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8(c), (d), 106.
¶111 In Drayden, the Ninth Circuit concluded that the prosecutor had engaged in misconduct when he delivered a soliloquy in the voice of the victim. 232 F.3d at 712. The Court of Appeals observed:
By doing so, the Prosecutor inappropriately obscured the fact that his role is to vindicate the public’s interest in punishing crime, not *262 to exact revenge on behalf of an individual victim. Furthermore, the prosecutor seriously risked manipulating and misstating the evidence by creating a fictitious character based on the dead victim and by “testifying” in the voice of the character as if he had been a percipient witness. Finally, by testifying as [the victim], the prosecutor also risked improperly inflaming the passions of the jury through his first-person appeal to its sympathies for the victim who, in the words of the prosecutor, was a gentle man who did nothing to deserve his dismal fate.
Drayden, 232 F.3d at 712-13.1 would add to this that channeling also risks infringing the defendant’s constitutional right to cross-examine her accusers face to face. U.S. Const. amend VI; Mont. Cost. art. II, §24.
¶112 In Criswell, which involved charges of aggravated animal cruelty, the prosecutor disparaged the defendants during his closing argument, calling them “squatters” and ‘freeloaders.” He also asserted that they had been ‘fun out of Idaho” and implied that one of the defendants had purchased marijuana in lieu of providing food for his cats. See Criswell, ¶ 43. While the prosecutor maintained that his remarks had not been intended to inflame the jury or to comment on the defendants’ characters, Criswell, ¶ 45, Chief Justice McGrath questioned this explanation: ‘Personally, I find that hard to believe. If not intended to inflame the jury or comment on the Criswells’ characters, then what were they intended to do?” Criswell, ¶ 57 (McGrath, C.J., concurring). In my view, we should be asking the same question here.
¶113 In her closing argument, prosecutor Pierce stood before the jury, assumed I.N.’s persona, and gave a first-person narrative of “what my baby-sitter, the Defendant, did to me.” If not intended to inflame the passions of the jury through an appeal to their sympathies for this already sympathetic infant-victim, then what was this tactic intended to do? This was a case in which the prosecution had presented ample-and, at times, repetitious-festimony about the serious bodily injuries suffered by the victim. The prosecution also had presented multiple expert opinions that these injuries were not the result of an accidental fall from a crib. As Pierce observed in her closing argument, “witness after witness after witness” testified on these matters. Certainly, the prosecutor properly could have argued the State’s view of what these actual witnesses’ testimony showed. The prosecutor also could have urged the jury “to follow the trail of evidence and find Ugalde guilty.” Opinion, ¶ 58 (discussing the District *263 Court’s reasoning based on Clausell). But that is not what happened.
¶114 The prosecutor here purported to give actual testimony from an absent witness. This testimony reflected Pierce’s personal opinions about what I.N. might have said on the witness stand had he been able to appear as a witness. Opinions of this sort, however, are “a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor’s office and undermine the objective detachment that should separate a lawyer from the cause being argued.” ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8, Commentary, 108. Such tactics inappropriately obscure the fact that the prosecutor’s role is to vindicate the public’s interest in punishing crime, not to exact revenge on behalf of an individual victim. Drayden, 232 F.3d at 712-13. They seriously risk manipulating and misstating the evidence by creating a fictitious character based on the injured victim and by “testifying” in the voice of the character. Drayden, 232 F.3d at 713. And they risk improperly inflaming the passions of the jury through the first-person appeal to its sympathies for the victim. Drayden, 232 F.3d at 713. They also deny the defendant the right to cross-examine the fictitious witness.
¶115 The Court refuses to grant relief because Ugalde did not contemporaneously object to the prosecutor’s channeling.[2] Opinion, ¶ 62. Somewhat ironically, however, the Court then denies relief on Ugalde’s claim of ineffective assistance of counsel (premised on defense counsel’s failure to object to the improper closing argument) because “many lawyers refrain from objecting during... closing argument”and “failure to object does not qualify as unreasonable conduct by trial counsel.” Opinion, ¶ 82 (ellipsis in original, internal quotation marks omitted). It seems to me that if failure to object does not qualify as unreasonable conduct by trial counsel, then we ought to review Ugalde’s prosecutorial misconduct claim on its merits. Conversely, if *264 an objection was required in order to preserve this claim for appeal, then defense counsel was ineffective for not making one and we should review the claim. At the very least, the claim should be considered under plain error review.
¶116 We have stated repeatedly that misconduct by a prosecutor may form the basis for granting a new trial where the prosecutor’s actions have deprived the defendant of a fair and impartial trial. State v. Gray, 207 Mont. 261, 266-67, 673 P.2d 1262, 1265-66 (1983); State v. Arlington, 265 Mont. 127, 158, 875 P.2d 307, 325 (1994); State v. Hayden, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091. We have also explained that the applicability of plain error review must be decided on a “case-by-case” basis. State v. Sullivant, 2013 MT 200, ¶ 17, 371 Mont. 91, 305 P.3d 838; Daniels, ¶ 20. Under this doctrine, we may review a claimed error that implicates a defendant’s fundamental constitutional rights4ncluding claims of prosecutorial misconduct-where failing to review the error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. Hayden, ¶¶ 17, 29-30; State v. Finley, 276 Mont. 126, 137-38, 915 P.2d 208, 215 (1996), overruled on other grounds, State v. Gallagher, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817.
¶117 Here, I believe the prosecutor’s channeling the infant-victim in closing arguments denied Ugalde her constitutional right to a fair trial. The channeling was neither brief nor harmless. It was calculated to play on the emotions and sympathy of the jury. I.N. spoke to the jurors through Pierce, describing the assault, the surgeries, how his life is no longer the same, that he no longer can tell his mother he loved her, and that he can only speak three words. Pierce asserted that “[I.N.] was the only witness, besides the Defendant, to tell you what happened to him on June 11th of 2008.” Pierce asked the jurors to tell I.N. that they heard him and to tell Ugalde that they know what happened that day. The evidence presented at trial concerning the impact upon the eight-month-old victim and the cause of his injuries was overwhelming. But that does not justify our overlooking a prosecutor’s improper closing argument that was calculated to appeal to the jury’s emotions, passion, and sympathy. This tactic undermined the fundamental fairness of the trial. I therefore would reverse for plain error and remand for a new trial.
¶118 In closing, I note there may be many reasons why defense counsel does not object to improper argument by the prosecutor. *265 Counsel may believe that an objection would draw attention to a particular fact or strengthen the argument being made. Counsel may fear a particular response from the judge or the prosecutor that would harm his or her client. It is not inconceivable that defense counsel may allow the prosecutor to continue an improper line of argument and thereby potentially build reversible error into the case. But whatever the reason for defense counsel’s silence, this Court’s ongoing refusal to address improper arguments such as here perpetuates tolerance of trial tactics that undermine fairness in our tribunals. As I have observed previously, “[t]he message that this increasingly prevalent practice is sending, unfortunately, is that prosecutors in this State can be assured of having their convictions upheld despite comments made during trial which violate ethical rules and ‘run the risk of undermining the fundamental fairness of the judicial process.’ ” State v. Aker, 2013 MT 253, ¶ 44, 371 Mont. 491, 310 P.3d 506 (McKinnon & Cotter, JJ., dissenting) (quoting State v. Lindberg, 2008 MT 389, ¶ 34, 347 Mont. 76, 196 P.3d 1252). Until there are actual consequences, such as reversal of the conviction, the problem is going to persist.
¶119 In response to this, the Court observes that we have “not yet decided whether a first-person narrative constitutes misconduct.” Opinion, ¶ 62. However, the fact that this Court has not yet reversed a case due to improper channeling is beside the point. The rules prohibiting this tactic are already well settled. In this regard, the Court does not dispute the following: that a prosecutor “should not make arguments calculated to appeal to the prejudices of the jury,” ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8(c), 106; that a prosecutor “should refrain from argument which would divert the jury from its duty to decide the case on the evidence,” ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8(d), 106; and that a prosecutor risks “manipulating and misstating the evidence”and ‘improperly inflaming the passions of the jury” by “testifying” in the voice of the victim, Drayden, 232 F.3d at 713. These standards were violated here when the prosecutor, in her closing argument, embarked on a first-person narrative in the voice of the victim. This tactic arguably ran afoul, as well, of our longstanding prohibitions against expressing a personal opinion about the guilt of the accused and commenting on evidence not of record. Gladue, ¶¶ 14, 21; Stringer, 271 Mont. at 381, 897 P.2d at 1071-72.
¶120 In the end, we fail today in our obligation to provide guidance to the bench and bar on a serious issue in the conduct of criminal *266 proceedings-an issue that the appellant has squarely raised in this appeal. We have rules which establish, at least in my view, that it is improper for the prosecutor during closing argument to employ tactics calculated to play on the emotions and sympathy of the jury. Channeling the victim is clearly designed to do just that. I believe we should say so explicitly, rather than avoid the question on a procedural ground.
¶121 I dissent.

 The Rodriguez court cited the following cases: Compare Sanchez v. State, 41 P.3d 531, 535 (Wyo. 2002) (prosecutor did not err by telling jury: ‘You and I get to speak for” the victim); State v. Braxton, 531 S.E.2d 428, 455 (N.C. 2000) (holding that prosecutor does not err by arguing that he speaks for victim); Henderson v. State, 583 So. 2d 276, 286 (Ala. Crim. App. 1990) (“we find no reversible error in a brief statement suggesting that the prosecuting attorney speaks for the victim’s family’); with U.S. v. Lowder, 5 F.3d 467, 473-74 (10th Cir. 1993) (although the comment did not deprive the defendant of a fair trial, prosecutor made an improper comment to the jury by stating: “Who gets left out? The victims get left out. They don’t get anybody to talk for them.’); People v. Brown, 624 N.E.2d 1378, 1388, 1391-92(Ill. App. IstDist. 1993) (prosecutor’s statement that "we speak for the victims in this case” was irrelevant to defendant’s guilt, and while no single trial error required reversal, cumulative error did); State v. Roberts, 838 S.W.2d 126, 131 (Mo. App. E. Dist. 1992) (although the comment did not require reversal, prosecutor made an improper statement by arguing: ‘The victim, Mr. Booker, isn’t here to speak for himself and able or not, it is my job to speak for Mr. Booker and Mr. Booker was a man with a family.’).

 The Court cites Drayden as support for the Court’s decision to deny review of Ugalde’s claim. Opinion, ¶ 61. Drayden, however, was a federal habeas corpus proceeding. After finding that the prosecutor engaged in misconduct by delivering a soliloquy in the voice of the victim, the Court of Appeals then considered the separate question whether this misconduct warranted the grant of federal habeas relief. In so doing, the court applied a standard of review that is specifically deferential to state-court proceedings. Drayden, 232 F.3d at 713. The present case, in contrast, is a direct appeal from a criminal conviction, not a habeas corpus proceeding. And there are no similar federal-state comity concerns in our review of Ugalde’s claim. For these reasons, the Court’s reliance on the portion of the Drayden opinion discussed at ¶ 61 of the Opinion is misplaced.