FILED

06/08/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0187

DA 18-0187

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 148

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

WESLEY SMITH,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-32-2016-136-IN
Honorable Leslie Halligan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Deborah S. Smith (argued), Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Jonathan M. Krauss (argued), Assistant Attorney General, Helena, Montana

          Kirsten H. Pabst, Missoula County Attorney, Missoula, Montana

Argued: February 17, 2021
Submitted: February 23, 2021
Decided: June 8, 2021

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Wesley John Smith appeals his conviction of one count of Sexual Abuse of Children in violation of § 45-5-625, MCA. The Fourth Judicial District Court imposed a 100-year sentence to the Montana State Prison with eighty years suspended. Smith challenges the admission at trial of the alleged victim's taped forensic interview as improper hearsay; the prosecutor's closing arguments; and a condition in his sentence that requires Department of Corrections ("DOC") supervision through Global Positioning System ("GPS") monitoring for the remainder of his life. We affirm.

¶2 We restate the issues on appeal as follows:

1. *Did the District Court misinterpret M. R. Evid. 801(d)(1) and abuse its discretion by admitting the victim's taped forensic interview as a prior consistent or inconsistent statement?*

2. *Did the prosecutor's closing arguments amount to plain error that entitles Smith to a new trial?*

3. *Is the requirement for GPS monitoring imposed by § 45-5-625(4)(b), MCA, facially unconstitutional under the Montana and United States Constitutions?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On January 17, 2016, Smith, his wife Katie, Katie's nine-year-old daughter E.G., and the couple's three younger sons planned to watch a football game at a local bowling alley. Katie left early to meet her brother at the bowling alley, leaving Smith to get the children ready and bring them separately. At the time, Smith and Katie were going through a contentious divorce. Katie nonetheless often would let Smith stay at the house she shared with her friend Charity and Charity's two children because Smith did not have a home of his own. Katie and Charity worked as exotic dancers, and Charity had a pole in her

2

personal bedroom the two used for practice and for teaching dance and aerobics lessons. The day before the underlying incident occurred, Smith and Katie revealed to E.G. that Smith was not her biological father.

¶4　　When Katie left for the bowling alley, E.G. was alone in her room watching videos on her computer while the three boys were in a downstairs room watching television. E.G. testified that Smith entered her room without knocking and told E.G. to go into Charity's room. There, Smith told E.G. to take off all her clothes besides her bra and underwear and spin around on the pole. E.G. told Smith she did not want to, but Smith told her to do it and said "it was okay because [E.G.'s] mom did it." Scared and upset by Smith's tone, E.G. complied with his demands. E.G. testified that while she spun around on the pole, Smith stood watching her in his underwear with his pants around his ankles, rubbing his fingers and thumb together and biting his lip. Smith did not touch E.G. while she was on the pole and kept his hands in the air, but E.G. testified that his penis got bigger. When asked about later telling her friend M.H. that he was "playing with himself," she said, "he wasn't, like, playing with it, playing with it. But he was, like, adjusting his underwear." Eventually, Smith told E.G. she could stop, thanked her, and said he "appreciated it." E.G. collected her clothes and ran to her bedroom.

¶5　　Soon after, Smith gathered the boys and E.G. and drove them all to the bowling alley; roughly thirty minutes had elapsed since Katie left. E.G. did not tell her mother what happened, but the next day she told her friend M.H. about the incident. M.H. apparently told her school counselor about the incident, who then informed E.G.'s own school counselor, Chrystal Thompson-Tower. Thompson-Tower testified she did not

3

specifically remember a call from M.H.'s counselor but had called E.G. into her office and asked E.G. to tell her what happened with Smith, which E.G. did. Thompson-Tower's notes from the meeting indicated that E.G. told her E.G.'s brothers were present in the room while Smith made her dance, but at trial E.G. denied she told Thompson-Tower this. Thompson-Tower reported the incident to the authorities and to Katie.

¶6 Katie took E.G. to First Step Resource Center, a children's advocacy center, several days later. Jane Hammett, a registered nurse and trained forensic interviewer, conducted an hour-long, video-recorded interview with E.G. During the interview, E.G. recounted the incident and discussed unrelated incidents between Smith and E.G.'s mother and brothers. Among other statements, E.G. told Hammett that her brothers were downstairs watching television when Smith had her spin on the pole.

¶7 Smith left Missoula on January 19—the same day E.G. told her school counselor about what happened—and moved in with his grandmother in Oregon. He would eventually be arrested in Oregon on an unrelated matter and spend time in jail before facing these charges in Montana.

¶8 The case went before a Missoula County jury in June 2017. The jury heard testimony from E.G., Katie, Thompson-Tower, Hammett, and the investigating officer. Katie testified that once she heard about what happened from the school, she approached Smith and—deliberately lying—told him that Charity had cameras recording in her bedroom. Katie stated that Smith, at that point, began profusely apologizing and stated that he deserved to die; she later received suicidal text messages from Smith. She further testified that after Smith moved away from the area, he periodically texted her and E.G. on

4

their cellphones or tried to call them, expressing contrition about what happened, that he loved her, and more suicidal ideation. Some of these text messages and voicemails were introduced into evidence.

¶9 Thompson-Tower recounted her conversation with E.G. about the incident. On cross-examination, defense counsel questioned Thompson-Tower extensively on her notes from her conversation with E.G., specifically regarding whether E.G.'s brothers were present in the room while it occurred. Thompson-Tower testified that although she noted that E.G. said her brothers were present in the room when Smith made her dance on the pole, she was just "going off of what a little kid is telling [her]" and did not know what E.G. meant. Hammett testified to her observations of E.G. during the forensic interview, such as the details E.G. provided her and E.G.'s demeanor. The investigating officer, Connie Brueckner, watched E.G.'s forensic interview and interviewed E.G.'s friends and family. Brueckner testified that she fulfilled a similar role to Hammett as a neutral factfinder. In Brueckner's opinion, E.G.'s testimony and statements in the forensic interview had the normal amount of "variation" that occurs when a "[story is] told to different people who are asking different kinds of questions" and generally seemed reliable. On cross-examination, Brueckner testified regarding her interview with M.H., in which M.H. said that E.G. told her Smith was playing with himself during the incident. Smith did not voice any hearsay objections to these witnesses' testimony.

¶10 During the lunch recess after Hammett's testimony, the State informed the judge that it sought to introduce E.G.'s video recorded forensic interview because "the defense's main theme . . . is that [E.G.] made this up" and it was "important for the jury to see

5

[E.G.'s] demeanor, particularly given the fact that this event happened so long ago and that she's had to retell it so many times . . . particularly when her credibility's being attacked." The State argued that the recording was admissible as "a prior consistent statement for a witness [for whom the defense has] pointed out . . . inconsistencies." The defense objected, and the District Court considered the matter, eventually allowing the recording to be admitted. Smith filed a motion to reconsider. The District Court issued an order affirming that under M. R. Evid. 801(d)(1)(B) the video was admissible as a prior consistent statement; to the extent there were any inconsistencies in the video, the video was admissible under M. R. Evid. 801(d)(1)(A) as a prior inconsistent statement; or that it was admissible as a mix of the two. The State played a redacted version of the video recording for the jury and rested its case.

¶11    The first and only witness in his case-in-chief, Smith testified that as he was getting the boys ready to go to the bowling alley, he went into E.G.'s room to tell her to get ready to go. As the boys were getting ready, he went back upstairs and found E.G. in Charity's room playing, not dancing, on the pole. Smith testified that he grabbed some of his clothes from Katie's room and headed towards the bathroom but stopped again in front of Charity's room to tell E.G. again to get ready. According to Smith, he quickly changed into new pants while he stood in the doorway. Smith stated further that he never told E.G. to take all her clothes off, only that she needed to change out of the dirty sweater and spandex shorts she was wearing before they went to the bowling alley. Smith testified that after he said this, E.G. became very upset because that was her favorite sweater and she wanted to wear it. He then told E.G. that she should not be in Charity's room without her permission.

6

Smith stated that after this exchange he went downstairs to finish getting the boys ready, went back upstairs, saw that E.G. was properly dressed, and they all went to the bowling alley together.

¶12 Smith objected once during the State's closing argument when the prosecutor began discussing the video interview. The trial court did not sustain the objection but cautioned the prosecutor not to use the interview to bolster E.G.'s testimony. The prosecutor continued her argument, and Smith made no further objections. After deliberating for five hours, the jury returned a guilty verdict.

¶13 The District Court sentenced Smith under § 45-5-625, MCA (2015),[1] imposing a 100-year prison sentence with all but twenty years suspended, and designated Smith as a Level I sexual offender. Pursuant to § 46-18-222(6), MCA, the District Court found Smith eligible for the exception to the twenty-five-year mandatory minimum term of imprisonment and did not impose a parole restriction. Additionally, pursuant to § 45-5-625(4)(b), MCA, the District Court required Smith to participate in satellite-based monitoring through the DOC for the remainder of his life once released from prison.

## STANDARDS OF REVIEW

¶14 We review evidentiary rulings for an abuse of discretion. *State v. McOmber*, 2007 MT 340, ¶ 10, 340 Mont. 262, 173 P.3d 690 (citing *State v. Gomez*, 2007 MT 111, ¶ 18, 337 Mont. 219, 158 P.3d 442). A district court abuses its discretion when it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of

---

[1] The relevant portions of this statute are the same as the current version.

7

reason, resulting in substantial injustice. *McOmber*, ¶ 10. A district court's evidentiary rulings must be supported by the "rules and principles of law"; therefore, "to the extent that a discretionary ruling is based on a conclusion of law . . . we must determine whether the court correctly interpreted the law." *McOmber*, ¶ 10 (quoting *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, 134 P.3d 45).

¶15 This Court does not generally review on appeal issues that were not objected to at trial. Under the plain error doctrine, however, we may invoke discretionary review "in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *State v. Hayden*, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091 (citing *State v. Daniels*, 2003 MT 247, ¶ 20, 317 Mont. 331, 77 P.3d 224). We review prosecutorial misconduct claims to determine whether the alleged misconduct deprived the defendant of a fair and impartial trial. *Hayden*, ¶ 27 (citing *Clausell v. State*, 2005 MT 33, ¶ 11, 326 Mont. 63, 106 P.3d 1175).

¶16 Finally, we review criminal sentences for legality. *State v. Ber Lee Yang*, 2019 MT 266, ¶ 8, 397 Mont. 486, 452 P.3d 897 (citing *State v. Coleman*, 2018 MT 290, ¶ 4, 393 Mont. 375, 431 P.3d 26). A claim that a sentence violates a constitutional provision is reviewed de novo. *Ber Lee Yang*, ¶ 8 (citing *State v. Tam Thanh Le*, 2017 MT 82, ¶ 7, 387 Mont. 224, 392 P.3d 607).

**DISCUSSION**

¶17 *1. Did the District Court misinterpret M. R. Evid. 801(d)(1) and abuse its discretion by admitting the victim's taped forensic interview as a prior consistent or inconsistent statement?*

¶18 "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). M. R. Evid. 801(d)(1) excludes certain statements from the definition of hearsay, including a person's prior statement when "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence, or motive."

¶19 For a prior consistent statement to be admissible under Rule 801(d)(1)(B): "(1) the declarant must testify at trial and (2) be subject to cross-examination concerning her statement, and (3) the statements to which the witness testifies must be consistent with the declarant's testimony, and (4) the statement must rebut an express or implied charge of subsequent fabrication, improper influence or motive." *McOmber*, ¶ 13 (quoting *State v. Teters*, 2004 MT 137, ¶ 25, 321 Mont. 379, 91 P.3d 559). The rule applies only "when the declarant's in-court testimony has been impeached by another party's allegations of subsequent fabrication, improper influence, or motive." *McOmber*, ¶ 15 (quoting *State v. Lunstad*, 259 Mont. 512, 515, 857 P.2d 723, 725 (1993)). The statement "must have been made *before* the alleged motive to fabricate arose." *McOmber*, ¶ 15 (emphasis in original) (citing *Teters*, ¶ 27; *State v. Veis*, 1998 MT 162, ¶ 24, 289 Mont. 450, 962 P.2d 1153).

¶20 Smith argues that E.G.'s forensic interview is not a prior consistent statement under Rule 801(d)(1)(B) because her alleged motive to fabricate the sexual abuse was to get Smith "out of the house" after she learned that he was not her biological father. Because E.G. was "lying all along," Smith argues that the forensic interview was not made before her motive to fabricate the allegations against him arose. Instead, the only purpose the forensic interview served—and the purpose for which the State actually used it—was to corroborate and bolster E.G.'s in-court testimony.

¶21 The State does not contest Smith's analysis of Rule 801(d)(1)(B) but counters that E.G.'s interview statements constitute "mixed" inconsistent and consistent statements admissible under our prior rulings in *State v. Mederos*, 2013 MT 318, 372 Mont. 325, 312 P.3d 438, and *State v. Lawrence*, 285 Mont. 140, 948 P.2d 186 (1997). Alternatively, the State argues that to the extent any of the statements contained in E.G.'s forensic interview were improperly admitted, the error was harmless.

¶22 We held in *Lawrence* that "a claimed lapse of memory is an inconsistency within the meaning of Rule 801(d)(1)(A)." *Lawrence*, 285 Mont. at 159, 948 P.2d at 198. There, a witness in a murder case, Mary Jenkins, participated in five pre-trial interviews. *Lawrence*, 285 Mont. at 156, 948 P.2d at 196. During the interviews, Jenkins answered some factual questions definitively; when asked the same or a similar question later, however, she frequently changed her answers to "I don't know" or "I can't remember." *Lawrence*, 285 Mont. at 156, 948 P.2d at 196. A medical diagnosis later established that Jenkins suffered from Alzheimer's induced dementia; the district court nonetheless found her competent to testify. *Lawrence*, 285 Mont. at 156, 948 P.2d at 196.

¶23    At trial, the prosecutor asked Jenkins the same questions she was asked in her pre-trial interviews, but Jenkins frequently stated she could not remember their answers; Jenkins's lack of memory continued even under the defense's leading questions on cross-examination. *Lawrence*, 285 Mont. at 157, 948 P.2d at 196. The prosecution eventually sought to introduce Jenkins's previous definitive answers as prior consistent statements; the defense objected on foundational grounds, but the district court permitted them under Rule 801(d)(1). *Lawrence*, 285 Mont. at 157, 948 P.2d at 196. We affirmed the district court, holding that a witness's claimed lapse of memory is an inconsistency under Rule 801(d)(1)(A). *Lawrence*, 285 Mont. at 159, 948 P.2d at 198. Applying that principle to the underlying facts, we observed that "the nature of [Jenkins's] trial testimony made it especially difficult for the [d]istrict [c]ourt to parse out specific inconsistent and consistent statements." *Lawrence*, 285 Mont. at 160, 948 P.2d at 198. We concluded that the district court did not abuse its discretion in characterizing Jenkins's lapse in memory as inconsistent statements, nor in admitting some consistent statements with the inconsistent ones for reasons of judicial efficiency and assisting the jury. *Lawrence*, 285 Mont. at 160, 948 P.2d at 198; *see also State v. Howard*, 2011 MT 246, ¶ 31, 362 Mont. 196, 265 P.3d 606.

¶24    We addressed a similar issue in *Mederos*. There, two young girls, A.R. and A.S., alleged that Mederos sexually assaulted them. *Mederos*, ¶ 5. The girls' pre-trial forensic interviews resulted in vague and unclear accounts about what had happened. *Mederos*, ¶ 6. The two girls testified at trial, offering "disjointed and, at times, contradictory testimony about what happened," often responding when pressed for details that they did not

11

remember what occurred. *Mederos*, ¶ 7. The girls' mothers and grandfather testified at trial to the girls' prior inconsistent statements, including but not limited to statements the girls made to them identifying Mederos and describing when and how the assaults occurred. *Mederos*, ¶¶ 18–19.

¶25 On appeal, Mederos claimed that his counsel was ineffective for failing to object to the mothers' and grandfather's testimony. *Mederos*, ¶ 11. We rejected that argument, noting that A.R. and A.S. "frequently responded that they did not know or could not remember answers to questions during direct and cross-examination" and that the testimony they provided could "charitably" be described as vague and unclear. *Mederos*, ¶ 17. We concluded it was therefore proper for the girls' prior inconsistent statements to be introduced through other witnesses. *Mederos*, ¶ 18. Further, in such a situation, "to parse the [victims'] consistent statements from the inconsistent statements likely would have made the witnesses' testimony disjointed and confusing." *Mederos*, ¶ 18. We concluded that the witnesses' testimony was proper under Rule 801(d)(1)(A) and Mederos's counsel could have had strategic reasons for not objecting. *Mederos*, ¶¶ 20–21.

¶26 Here, the State argues that E.G. made statements to Hammett inconsistent with her trial testimony that she did not remember that she did *not* tell Hammett that Smith was "playing with himself or touching his penis, or that [she] was forced by Smith to dance on the pole in front of her brothers." The State also points to several things E.G. said at trial that she did not say during the forensic interview: that Smith offered and gave E.G. twenty dollars for dancing on the pole; that Smith told her it was okay to do it because E.G.'s mom

12

did it; that Smith called her a "pussy"; and that Smith told E.G. to go faster and faster. The State also points to statements E.G. made in the forensic interview but not at trial: that she was scared Smith might do something to hurt her brothers; that she was afraid Smith might take her brothers away; that Smith was making "moaning sounds" while she was on the pole; that she was crying while on the pole; that Smith grabbed her arm when he came back into her room; and that Smith told her not to tell anybody. The State alleges these differences and omissions amount to the same type of inconsistencies found in *Mederos*, *Lawrence*, and *Howard*, and thus the forensic interview properly was admitted along with any consistent statements it also contained.

¶27 The State adopts an incomplete view of our holdings in *Mederos* and *Lawrence*. Both involved a witness's lapse of memory at trial regarding prior declarations of fact they *actually made*, not a lapse of memory regarding statements they *did not* actually make. *See Lawrence*, 285 Mont. at 157, 948 P.2d at 196 ("[T]he prosecution asked [Jenkins] the same or similar questions as had been asked of her during the interviews . . . most of her testimony was that she couldn't remember. On cross-examination, [Jenkins] often retracted her definitive answers that she made on direct by saying she could not remember."); *Mederos*, ¶¶ 17, 19 ("A.R. and A.S. frequently responded that they did not know or could not remember answers to questions during direct and cross-examination . . . For example, A.S. testified that she had talked to her mother about Mederos on February 28, 2011. Mederos's counsel asked A.S. on cross-examination when she first had told her mother that Mederos had been molesting her. A.S. responded that she did not remember.").

13

¶28 Here, in contrast, the State cites the following statements made on cross-examination as evidence of E.G.'s lapse of memory regarding what she said during the forensic interview:

> Q. You didn't . . . tell [Hammett] that [Smith] was playing with himself, right?
>
> A. Not that I remember.
>
> Q. Okay. And you also didn't tell [Hammett] that [Smith] made you do this in front of your three little brothers, right?
>
> A. I can't remember that.

E.G. already had testified on direct examination:

> Q. During any of this, was anybody else in [Charity's room]?
>
> A. No.
>
> Q. Do you remember ever telling anybody that somebody else was in there, like your brothers?
>
> A. No.
>
> .    .    .
>
> Q. So at any point [when you were in Charity's room], were your brothers in there watching this?
>
> A. No.
>
> Q. How sure about that are you?
>
> A. I'm very sure because the door was shut.

¶29 Unlike *Lawrence* and *Mederos*, E.G. did not demonstrate a lack of memory regarding declarations of fact she made during her testimony or in response to questions Hammett actually asked in the forensic interview. The questions highlighted by the State

14

as establishing an inconsistency are not questions regarding facts E.G. disclosed during the forensic interview; they are questions regarding statements she *did not* make. E.G. testified consistently at trial and during the forensic interview that her brothers were not present in the room with her and that Smith was not "playing with himself."[2] With this in mind, E.G.'s answers of "[n]ot that I remember" and "I can't remember that" are not "lapses of memory." E.G. had no memory of "tell[ing] [Hammett] that [Smith] was playing with himself" or "tell[ing] [Hammett] that [Smith] made [her] do this in front of [her] three little brothers" because she did not tell Hammett those things.

¶30 The State's argument also misses an important distinction between E.G.'s testimony and that of the witnesses in *Lawrence* and *Mederos*. E.G. testified coherently and clearly at trial. She rarely stated she did not know the answer to a question, let alone questions about what occurred in Charity's room. To the extent there were inconsistencies, they were relatively immaterial, and E.G.'s testimony did not make it "difficult for the court to separate the consistent from inconsistent portions of the prior statement." *Mederos*, ¶ 18. Unlike *Lawrence* and *Mederos*, E.G.'s alleged prior inconsistent statements were introduced through video, not through the testimony of other witnesses. Our review of the forensic interview video leaves us convinced that E.G. was detailed in her recollections to Hammett and consistent with what she told the jury; inconsistent portions, if any, could have been isolated and played for the jury without other portions of the interview being introduced.

---

[2] E.G.'s statement about Smith "playing with himself" was not made in the forensic interview but to her friend M.H.—and E.G. clarified on the stand what she meant.

15

¶31 We likewise do not agree with the State that simply because E.G. mentioned certain facts in the forensic interview that she did not mention at trial, or vice-versa, her forensic interview statements are therefore inconsistent with her trial testimony. Indeed, many of the differences the State points out are better classified as omissions rather than inconsistencies. Hammett testified to her role as a "neutral factfinder" and that the goal of a forensic interview is to "elicit [a] narrative" from the victim. At trial, however, E.G.'s testimony was directed by the prosecutor or, on cross-examination, by the defense. Both parties were able to draw out certain things she said during the forensic interview and crafted their questions to elicit the testimony important to their respective theories of the case. Additionally, the State properly steered away from eliciting testimony about E.G.'s fears that Smith may hurt her family or brothers, which could have raised the severed domestic abuse charges Smith faced. We conclude that E.G.'s trial testimony was not inconsistent with her forensic interview and could not properly be admitted as "mixed" consistent and inconsistent statements.

¶32 The District Court also reasoned that E.G.'s forensic interview qualified as a prior consistent statement under M. R. Evid. 801(d)(1)(B) because it read the word "subsequent" in Rule 801(d)(1)(B) to modify only "fabrication," not "improper influence" or "motive." We have held unequivocally, however, that "to qualify as a prior consistent statement under M. R. Evid. 801(d)(1)(B), the statement must have been made *before* the alleged motive to fabricate arose." *McOmber*, ¶ 15 (emphasis original); *see also Teters*, ¶ 27 ("prior consistent statements are admissible only when a specific motive to fabricate is alleged and the prior consistent statements were made before the time the alleged motive

16

to fabricate arose"). The Commission Comments to Rule 801(d)(1)(B) likewise make clear that the modifier "subsequent" is not limited to just "fabrication," but it rather modifies improper influence and motive as well. *See* Commission Comments, M. R. Evid. 801 (Stating that a prior consistent statement is allowed to rehabilitate a witness impeached on the grounds mentioned in the clause "because [the consistent statement] was made prior to the existence of the impeaching evidence." "Evidence" is clearly meant in context to refer to evidence of fabrication, improper influence, or motive.). The District Court's interpretation of Rule 801(d)(1)(B) is therefore erroneous as a matter of law.

¶33 At trial, Smith argued that E.G.'s motive to fabricate the story was to get Smith, whom E.G. just learned was not her real father, out of the house—a motive arising before E.G.'s forensic interview. During the arguments surrounding the introduction of the forensic interview, the District Court observed that Smith, through his questioning of witnesses, implied to the jury that E.G.'s motive to fabricate the story arose from her conversations with M.H.—conversations that occurred before her forensic interview. As noted, the State does not argue on appeal that Smith ever alleged any motive, fabrication, or improper influence arising after the forensic interview. The statements E.G. made during her forensic interview therefore are not excluded from the definition of hearsay, and the District Court erred to the extent it admitted the forensic interview as a prior consistent statement.

¶34 Not every error committed by a District Court is reversible. *State v. Van Kirk*, 2001 MT 184, ¶ 29, 306 Mont. 215, 32 P.3d 735. "A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record

17

shows that the error was prejudicial." Section 46-20-701(1), MCA. The first step in our harmless error review is to categorize the error as structural or trial error; structural error "affects the framework within which the trial proceeds"; trial error "is that type of error that typically occurs during the presentation of a case to the jury." *Van Kirk*, ¶¶ 38–40 (citations omitted). The admission of the forensic interview video was trial error. *See State v. Kaarma*, 2017 MT 24, ¶ 89, 386 Mont. 243, 390 P.3d 609. We thus inquire if "there is a reasonable possibility that the inadmissible evidence might have contributed to" Smith's conviction. *Kaarma*, ¶ 89 (citing *Van Kirk*, ¶ 42). Inadmissible evidence is not prejudicial so long as the jury was presented with admissible evidence proving the same facts as the tainted evidence. *Kaarma*, ¶ 89 (citing *Van Kirk*, ¶ 43).

¶35 The State presented ample admissible evidence proving the same facts as the forensic interview. E.G.'s unfaltering testimony at trial established all the facts necessary for the jury to convict Smith. True, the forensic interview bolstered and lent credibility to her testimony. But other witnesses provided admissible testimony tending to lend the same credibility to E.G.'s trial testimony—testimony to which Smith did not object. Hammett testified to her impressions of E.G.'s demeanor and composure during the interview. Thompson-Tower testified that she had no reason to suspect E.G. was fabricating her story, and that E.G. had no history of lying at school. And then there were Smith's own statements. Katie testified that Smith admitted he made E.G. dance on the pole and apologized after she told him video cameras in the room recorded the entire incident. Finally, Smith's text messages and voicemails, revealing Smith's impassioned expression of contrition, provided compelling evidence giving credence to E.G.'s account of what

18

happened. Given the quality of admissible, untainted evidence presented at trial, there is not a reasonable possibility that the forensic interview contributed to Smith's conviction. We conclude that Smith's right to a fair trial was not prejudiced. *Van Kirk*, ¶ 29.

¶36   *2. Did the prosecutor's closing arguments amount to plain error that entitles Smith to a new trial?*

¶37   During the State's initial closing argument, the prosecutor began to discuss the video interview, drawing an objection from Smith that the State could not use the video to comment on "the consistency of [E.G.'s] statements." The court allowed the prosecutor "to continue in light of the objection" and advised her not to "re-bolster[] those things, but to remind the jury what they can consider when they're deliberating." The prosecutor then said:

> There were several times in there where [E.G.] would correct the . . . questioner and make sure they weren't operating on false questioning. I'm not [going to] go through what [E.G.] said about what happened to her, what the defendant did to her, but there are pieces of that interview that are circumstantial indicators of corroboration.

Smith did not renew the objection or object further. He contends on appeal that this argument disregards the District Court's admonishment.

¶38   The defense's primary argument in closing was that E.G. told multiple versions of the incident to different people in an effort to get the person she just learned was not her father out of the family. The defense argued that it did not make sense for Smith to try to abuse E.G. during a brief thirty-minute period when he could have done it some other time, and that the apologies contained in his text messages and voicemails were for moving away

19

from the family, not for abusing E.G. The defense urged the jury to find reasonable doubt from this evidence.

¶39 In rebuttal, the State argued that "this is not a family that walks around nude or partially nude," that Smith told E.G. to "[d]o it like your momma," that E.G. described the incident in terms she would not have used if she was being coached, and that Smith lied about not remembering his phone number when questioned on the stand. The State concluded by stating that "[j]ustice protects innocence" and that the jury should convict Smith because "[t]he law requires it, the testimony warrants it, but justice demands it." Defense counsel did not object to the rebuttal argument.

¶40 Smith argues that the prosecutor with these comments violated his right to a fair trial by improperly relying on the forensic interview and by telling the jury that Smith "lied," that E.G. was telling the truth, and that justice demands a conviction. Because Smith did not object to these arguments at trial, he urges us to review them for prosecutorial misconduct under the plain error doctrine.

¶41 Generally, we do not address on appeal a defendant's claim of prosecutorial misconduct when he did not object at trial; we may in our discretion review the issue for plain error. *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506 (citing *State v. Lacey*, 2012 MT 52, ¶ 14, 364 Mont. 291, 272 P.3d 1288). We apply plain error review sparingly, "in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or

20

compromise the integrity of the judicial process." *Aker*, ¶ 21 (quoting *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799).

¶42 The right to a fair trial by jury is guaranteed by the Sixth Amendment to the United States Constitution and by Article II, Section 24, of the Montana Constitution. *Aker*, ¶ 24 (citing *Hayden*, ¶ 27). A prosecutor's misconduct is ground for reversing a conviction when the conduct "deprives the defendant of a fair and impartial trial." *Aker*, ¶ 24 (quoting *McDonald*, ¶ 10). We review alleged improper statements during a closing argument in the context of the entire argument; we do not presume prejudice from the alleged misconduct, and the burden is on the defendant to show the argument violated his substantial rights. *Aker*, ¶ 24 (citing *State v. Makarchuk*, 2009 MT 82, ¶ 24, 349 Mont. 507, 204 P.3d 1213; *McDonald*, ¶ 10).

¶43 Smith alleges the prosecutor committed plain error in her closing argument when she relied on the forensic interview to corroborate E.G.'s testimony, misstated the law, vouched for E.G.'s credibility, and misrepresented testimony of the witnesses. It is improper for a prosecutor to characterize the defendant or witnesses as liars or to offer personal opinions on a witness's credibility, but she may offer comments on "the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved in the instructions to the jury." *Aker*, ¶¶ 26–27 (internal quotation marks and citations omitted).

¶44 Smith challenges several comments the prosecutor made responding to Smith's arguments on rebuttal. First, the prosecutor argued that Smith told E.G. to "do it like your momma" and that had E.G. been coached, she would not have used these words. Smith is

correct that neither E.G. nor anyone else testified that Smith used those words. Instead, E.G. testified that Smith said "it was okay because my mom did it." The record reflects no intentional misrepresentation of testimony; either statement, "do it like your momma" or "it was okay because my mom did it," properly speaks to an element of the charged offense—the "use of a child in an exhibition of sexual conduct." Section 45-5-625(1)(a), MCA. Smith wanted E.G. to dance like her mother, an exotic dancer, and was not directing her merely to play or climb on the pole in a non-sexual manner.

¶45 Second, Smith challenges the State's argument that "this is not a family that walks around nude or partially nude," and the only time Smith stated he was walking around in his underwear happened to be at the moment E.G. stated he made her dance on the pole. Smith argues that he explained he was "really quickly" changing out of sweatpants in E.G.'s doorway. But the prosecutor argued, rhetorically, that "[Smith] just happened to be there in his underwear, changing clothes, walking from one bedroom to another where she was?" In context, the State was drawing the jury to a proper inference it could gather from the evidence.

¶46 Third, Smith takes issue with the prosecutor's statement that he lied about not remembering his phone number and saying he "didn't have any conversations with Katie. None." Smith testified that he could not remember his phone number because he changed it after leaving Missoula. Again, however, these comments were directed to the plausibility of Smith's trial testimony. The only witnesses to what occurred were Smith and E.G., and the trial was essentially over which of the two was more credible. We generally refrain

22

from invoking plain error review of improper closing argument regarding witness credibility. *See Aker*, ¶ 30 (citations omitted).

¶47 Unlike instances in which we have found a prosecutor improperly commented on the truthfulness of a witness, the prosecutor here did not offer her personal opinion on the credibility of witnesses but drew inferences from the evidence. *See Hayden*, ¶¶ 12–14, 32–33. The challenged rebuttal statements reflect a plausible interpretation of the testimony presented at trial. A prosecutor properly may comment both on the credibility of witnesses and on inferences the jury should draw from the evidence. *McDonald*, ¶ 14. Under the circumstances, Smith cannot demonstrate that these statements violated his substantial rights. *McDonald*, ¶ 10.

¶48 Finally, Smith argues that the State improperly argued that he "preyed on [E.G.'s] innocence," that "justice protects innocence," that E.G. stood up for the truth, and that the jury must tell her with its verdict "the truth matters," "what [Smith] did to her was wrong," and that the jury "believe[s] her" and should hold Smith responsible because "[t]he law requires it, the testimony warrants it, but justice demands it." The State presented these arguments in response to Smith's arguments that E.G. was lying about what happened in order to get Smith out of her family; that E.G. made up and continuously gave different versions of her story to different people; and that Katie was lying about Smith's admissions to her. Smith contends nonetheless that the prosecutor's statements invade the province of the jury to determine which witnesses to believe and the weight to afford each witness's testimony, that the State vouched for E.G.'s credibility, and that the prosecutor misstated the law.

23

¶49 It is the "jury's purpose and duty to decide if the State has proved the defendant's guilt beyond a reasonable doubt, based on the facts presented, . . . not to decide the case on the basis of sympathy or advocacy for the victim." *State v. Ritesman*, 2018 MT 55, ¶ 27, 390 Mont. 399, 414 P.3d 261 (citation and internal quotation marks omitted). Without deciding whether these arguments crossed that line, they were unobjected to at trial. The District Court clearly instructed the jury it was not to consider the statements of the attorneys as evidence, that it alone is the sole judge of the credibility of all witnesses in the case, and that "the law forbids [it] to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." We presume the jury followed these instructions. *See State v. Ariegwe*, 2007 MT 204, ¶ 168, 338 Mont. 442, 167 P.3d 815.

¶50 Of the challenged arguments, the most troubling is the prosecutor's reference to the forensic interview, as we have found error in the District Court's decision to admit the interview into evidence. The State did not, however, reference any statements E.G. made in the forensic interview, and made only a brief statement after the District Court admonished it. Smith does not contend that he preserved an objection to the comment or explain how that comment worked to his substantial prejudice in the context of the entire trial. We have held that the District Court's error in admitting the forensic interview was harmless. In light of the record as a whole, and in the context of the entire argument presented to the jury, we cannot conclude that failing to review the State's allegedly improper argument would "result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *McDonald*, ¶ 8.

24

¶51 "A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions." *Ritesman*, ¶ 28 (quoting *Aker*, ¶ 27). On the whole, the State's closing argument in this case met that principle. We conclude that Smith has not sustained his burden to demonstrate that the prosecutor's closing arguments justify reversal of his conviction for plain error. *See Ritesman*, ¶ 28.

¶52 *3. Is the requirement for GPS monitoring imposed by § 45-5-625(4)(b), MCA, facially unconstitutional under the Montana and United States Constitutions?*

¶53 The District Court sentenced Smith to a 100-year prison term, suspending all but twenty years. Should the Court affirm his conviction, Smith argues that it must remand to strike Condition 39 of his sentence. Condition 39 reads:

> If the Defendant is released after the mandatory minimum period of imprisonment, the Defendant is subject to supervision by the Department of Corrections for the remainder of the offender's life and shall participate in the program for continuous, satellite-based monitoring provided for in § 46-23-1010, MCA; as a result of the conviction in § 45-5-625(4)(b), MCA.

Smith argues that the statute authorizing this condition, § 45-5-625(4)(b), MCA, is unconstitutional under Article II, Sections 10, 11, 22, and 28, of the Montana Constitution and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

¶54 Section 45-5-625(4), MCA (2015), the law under which Smith was sentenced, provides in pertinent part:

> (a) If the victim was 12 years of age or younger and the offender was 18 years of age or older at the time of the offense, the offender:
> (i) shall be punished by imprisonment in a state prison for a term of 100 years. The court may not suspend execution or defer imposition of the first 25 years of a sentence of imprisonment imposed under this subsection (4)(a)(i) except

25

as provided in 46-18-222, and during the first 25 years of imprisonment, the offender is not eligible for parole.

. . .

(b)  If the offender is released after the mandatory minimum period of imprisonment, the offender is subject to supervision by the department of corrections for the remainder of the offender's life and shall participate in the program for continuous, satellite-based monitoring provided for in 46-23-1010.[3]

Smith argues that the statute is facially unconstitutional "because it mandates lifetime satellite monitoring of people whose sentences have been fully discharged" even though "their fundamental liberties have been fully restored[.]"   Smith contends that, as in *Ber Lee Yang*, the statute is facially invalid because of its mandatory nature; it permits no individualized inquiry.  He concedes that he did not make an as-applied challenge in the trial court, and thus he does not do so on appeal.  Through counsel, Smith clarified his position during oral argument: he is challenging only the post-sentence monitoring of an offender and, if the Court construes subsection (4)(b) to apply only during the 100-year mandatory term of sentence—which he does not challenge—then the facial challenge is resolved.  He urges the Court not to adopt an interpretation of

---

[3] Section 45-5-625(4)(a)(i), MCA (2019), has since been amended to read:

(i) shall be punished by imprisonment in a state prison for a term of 100 years. The court may not suspend execution or defer imposition of the first 25 years of a sentence of imprisonment imposed under this subsection (4)(a)(i) except as provided in 46-18-222(1) through (5), and during the first 25 years of imprisonment, the offender is not eligible for parole.  The exception provided in 46-18-222(6) does not apply.

The difference in language is not material to our decision.

subsection (4)(b) that allows supervision and GPS monitoring after a defendant has fully discharged the sentence.

¶55 The State has not argued for a different construction, maintaining that the statute does not and would not apply after a sentence has terminated. It urges the Court to read subsections (4)(a) and (4)(b) together; (4)(b)'s mandatory supervision applies only to the 100-year period imposed by (4)(a).

¶56 "The party challenging the constitutionality of a statute has the burden of proving beyond a reasonable doubt that it is unconstitutional." *Ber Lee Yang*, ¶ 14 (citation omitted). The party bringing a facial challenge "must show either that no set of circumstances exists under which the statute would be valid or that the statute lacks a plainly legitimate sweep." *Yang*, ¶ 14 (quoting *In re S.M.*, 2017 MT 244, ¶ 10, 389 Mont. 28, 403 P.3d 324) (internal quotation marks omitted). Statutes are presumed to be constitutional, a presumption that may be "overcome [only] after careful consideration of the purpose and effect of the statute." *Mont. Indep. Living Project v. State, DOT*, 2019 MT 298, ¶ 21, 398 Mont. 204, 454 P.3d 1216 (citations omitted). This Court construes statutes as a whole and in a manner to avoid their unconstitutionality. *See State v. Felde*, 2021 MT 1, ¶ 16, 402 Mont. 391, 478 P.3d 825; *Mont. Indep. Living Project*, ¶ 14.

¶57 Section 45-5-625(4), MCA, imposes a mandatory 100-year sentence. It provides further that an offender released from the mandated prison term will be "subject to supervision by the [DOC] for the remainder of the offender's life." Under Article II, Section 28, of the Montana Constitution, "[f]ull rights are restored by termination of state

27

supervision for any offense against the state." A person convicted under § 45-5-625(4), MCA, is sentenced to a lifetime of DOC supervision, notwithstanding the offender's release from incarceration.

¶58 In *Steilman v. Michael*, 2017 MT 310, ¶ 19, 389 Mont. 512, 407 P.3d 313, we rejected the State's argument that a sentence term of 110 years was, as a matter of law, not equivalent to a life sentence. We held, though, that because the offender in that case was eligible for day-for-day good time and could discharge his prison sentence in as little as 31-1/3 years, he did not have a de facto life sentence. *Steilman*, ¶¶ 22–23. *Steilman* is not directly on point here, because it challenged a sentence imposed on a youthful offender under recent United States Supreme Court pronouncements. Nonetheless, we looked toward the "practical effect" of the sentence at issue in reaching our decision. *See Steilman*, ¶ 23. Here, § 45-5-624(4), MCA, applies *only* when the offender is eighteen years of age or over—every offender convicted under this section will be at least 118 years of age when released from state supervision, even if his term of actual imprisonment is less. In such a circumstance, it is reasonable to construe subsections (a) and (b) together to mean that, as a "practical effect" of the sentence, the offender is under a mandatory lifetime sentence when a 100-year term is imposed.[4] And, should an offender be released from imprisonment

---

[4] This distinguishes the cases from other states that Smith cites in support of his argument. Each involved situations where an individual had completely served the original sentence and was no longer under state supervision. *See Park v. Georgia*, 825 S.E.2d 147, 152–53, 158 (Ga. 2019) (holding that a statute requiring persons designated as "sexually dangerous predators" be subjected to GPS monitoring for life, even after offenders had completed their entire sentence and had their privacy rights restored, facially violated the Fourth Amendment); *North Carolina v. Grady*, 831 S.E.2d 542, 553 (N.C. 2019) (concluding that the state's GPS monitoring program is unconstitutional in its application to individuals "based solely on their status as a statutorily defined 'recidivist' who have completed their prison sentences and are no longer supervised by

early, he still will be subject to DOC supervision for the balance of the sentence. Smith agrees that GPS monitoring is permissible during this period of supervision. The hypothetical circumstances Smith suggested at argument and in his briefs are not at issue here and would have to be raised on an as-applied basis.

¶59 The Legislature chose to have adults convicted of sexual abuse of children twelve or younger supervised for life, and Smith does not argue or demonstrate that such a punishment is invalid in all circumstances. The statute's requirement for lifetime supervision accords with a stated purpose of Montana's sentencing policies to "protect the public" and to "punish each offender commensurate with the nature and degree of harm caused by the offense and to hold an offender accountable." *See* § 46-18-101(2)(a), (b), MCA. Construing § 45-5-625(4)(b), MCA, in harmony with § 45-5-625(4)(a), MCA, we conclude that it passes facial constitutional muster.

## CONCLUSION

¶60 For the foregoing reasons, Smith's conviction and sentence are affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA

---

the State"); *South Carolina v. Ross*, 815 S.E.2d 754, 759 (S.C. 2018) (concluding that a court must make a reasonableness determination under the totality of the circumstances before imposing automatic, mandatory GPS monitoring on individuals who fail to register as sex offenders after they have completed serving their underlying sentences).